**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

PENNY CHARLAND, Individually and as
Parent and Natural Guardian of N.W., an Infant,
R.W., an Infant, and N.W., a minor,

                                    **Plaintiffs,**

    vs.                                       **1:11-cv-1191
(MAD/RFT)**

**JOHN NITTI, DEA Agent, and UP TO FOUR
UNKNOWN NAMED JOHN DOE
OFFICERS/AGENTS OF THE US JUSTICE
DEPARTMENT, THE FEDERAL BUREAU
OF INVESTIGATION, AND/OR THE
DRUG ENFORCEMENT AGENCY,**

                                      **Defendants.**
_____

**APPEARANCES:**                                  **OF COUNSEL:**

**OFFICE OF KEVIN E. JONES**          **KEVIN E. JONES, ESQ.**
566 Delaware Avenue
Albany, New York 12209
Attorney for Plaintffs

**OFFICE OF THE UNITED**            **KAREN FOLSTER LESPERANCE, ESQ.**
**STATES ATTORNEY**
James T. Foley U.S. Courthouse
445 Broadway
Albany, New York 12207
Attorneys for the United States

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiff Penny Charland, individually and as the guardian of her minor children, brings

this action pursuant to 42 U.S.C. Section 1983 and *Bivens v. Six Unknown Named Agents of the*

*Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[1] Plaintiffs allege that Defendants violated their federal constitutional rights in connection with their execution of an arrest warrant for one Mario Williams at Plaintiffs' home on October 5, 2010. *See* Complaint, Dkt. No. 1. Plaintiffs claim that Williams did not live at their home or have access to their home at the time the arrest warrant was executed, and that Defendants' unreasonable and mistaken execution of the arrest warrant resulted in an unlawful search and seizure in violation of their clearly established rights under the Fourth Amendment to the United States Constitution. Defendant John Nitti has moved for summary judgment on the ground of qualified immunity, asserting that, in executing the arrest warrant, he relied on a properly issued, valid arrest warrant. Defendant Nitti further argues that he is entitled to summary judgment on the ground that there is no evidence to establish that Plaintiffs' Fourth Amendment rights were violated, or that he had any personal involvement in any allegedly unlawful acts. *See* Dkt. No. 31-1.

## II. BACKGROUND[2]

In 2009, the Drug Enforcement Agency ("DEA"), Federal Bureau of Investigation ("FBI"), Schenectady Policy Department ("SPD"), and New York State Police ("NYSP") commenced a joint investigation of the Jaimie Toomer Drug Trafficking Organization ("DTO"), which regularly transported large quantities of cocaine, converted it to crack cocaine, and distributed it to

---

[1] On October 21, 2013, the Court entered a Stipulation and Order of Discontinuance as to Defendants the City of Schenectady, New York, up to five John Doe City of Schenectady Police Officers, and Donald Kiser. Plaintiffs have not amended their complaint, or sought leave to amend, to identify the four John Doe federal agents currently listed as defendants. Thus, the only remaining claims are Plaintiffs' *Bivens* claims against Defendant Nitti.

[2] The following facts are undisputed unless otherwise noted.

customers in the upstate areas of Schenectady and Albany, New York. *See* Dkt. No. 38-2 ("Plfs' SOMF") ¶ 1. During the investigation, law enforcement officials learned that Mario Williams was an important DTO figure, whose responsibilities included "cooking" powdered cocaine to transform it into crack cocaine for sale. *See id.* ¶ 2. On or about September 29, 2010, a grand jury in the Northern District of New York issued a superceding indictment charging Williams and fifteen co-defendants with conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846, and for use of a communications facility in connection with the distribution of a controlled substance, in violation of 21 U.S.C. § 843(b). *See id.* ¶ 3. Based on the indictment, a federal magistrate judge issued a warrant for Williams' arrest. *See id.* ¶ 4.

On Monday, October 4, 2010, DEA case agent Special Agent ("S/A") Peter LoBianco assigned S/A Nitti to lead a pre-arranged team of law enforcement officers to arrest Williams. In addition to S/A Nitti, the arrest team for Williams was composed of: DEA S/A Terrance Dunlap; DEA Task Force Officer ("TFO") Edward Watson; TFO John Morrow; TFO John Pologa; TFO Paul Graziano; three SPD officers; two NYSP officers; and FBI TFO John Degesualdo. *See id.* ¶ 5. Using information available through both public and investigative sources, including information that was supplied to him from Schenectady police officers who were familiar with Williams through prior police contact, LoBianco concluded that Williams resided with his girlfriend, Plaintiff Charland, at 2124 Avenue B in Schenectady, New York. *See id.* ¶ 6. Two alternate addresses were also identified as potential addresses for Williams in the event that he could not be found at the Avenue B address. LoBianco gave S/A Nitti a pre-arrest packet that included the arrest warrant, a photo of Williams, and information on the Avenue B address as well as the two alternate addresses. *See id.* ¶ 7.

At approximately 4:30 a.m. the following day, October 5, 2010, S/A Nitti drove to 2124 Avenue B in Schenectady. S/A Nitti claims that he observed that a second floor television was on and visible through the window and that lights were on in most of the rooms. *See* Dkt. No. 31-19 ("Nitti SOMF") ¶ 9. Plaintiffs claim that no lights were on in the house, but that two upstairs televisions were. *See* Plfs' SOMF ¶ 9. S/A Nitti also observed two vehicles in the driveway, a sports utility vehicle and a Cadillac. *See id.* ¶ 10.

About an hour later, the arrest team met at a remote location for a briefing by S/A Nitti about the execution of the arrest warrant for Williams. *See id.* ¶ 11. At that meeting, co-defendant SPD Officer Donald Kiser informed S/A Nitti that Williams was known to him from prior police contact, that he was familiar with both of the vehicles that were in the driveway, and that he had seen Williams driving both of them. *See id.* ¶ 12. Williams did drive both cars, but Plaintiffs contend that neither vehicle had license plates or an active registration at that time. *See id.* ¶ 13.

Defendant Nitti claims that, at the briefing, he stressed to the participating officers that they were executing an arrest warrant, not a search warrant, and that the law permitted them to search only places where the putative arrestee could be hiding, *i.e.*, in closets, under beds, and behind large furniture, including sofas. *See* Nitti SOMF ¶ 14. Plaintiffs claim that they have insufficient information to form a belief as to the truth of this assertion, and contend that even if those instructions were given, they were not followed by any of the officers, including Defendant Nitti. *See* Plfs' SOMF ¶ 14.

At approximately 6:00 a.m., the arrest team arrived at 2124 Avenue B in Schenectady. Team members took their places at predetermined locations around the perimeter of the residence. *See* Plfs' SOMF ¶ 15. Defendant Nitti claims that agents covering the perimeter of the home saw

4

lights on in rooms at the rear of the house and that a television was on in a second floor bedroom. *See* Nitti SOMF ¶ 16. Plaintiffs claim that no lights were on in the house, but that two upstairs televisions were on. *See* Plfs' SOMF ¶ 16. Once everyone was in place, S/A Nitti began knocking loudly on the door while yelling, "Police, open the door." *See id.* ¶ 17.

Upon receiving no response from inside the home, Nitti claims that he and S/A Dunlap continued to bang on the door and shout "Police!" for approximately twenty minutes. Following this twenty minute interval, Nitti claims that the agents covering the perimeter observed a light turn off in the rear of the home, raising the officers' suspicions that Williams was inside the home. *See* Nitti SOMF ¶ 18. Plaintiffs dispute that the officers banged and shouted for twenty minutes, and contend that Plaintiffs' landlord, who lives in the adjoining unit of Plaintiffs' two-family townhouse or duplex, woke up as soon as he heard the pounding and yelling, came down the stairs and was spotted by the police in his downstairs window. Plaintiffs further dispute that any lights were on or that any such light was turned off during this time period. Plaintiffs contend that the agents likely observed a flickering of lights that was simply light emanating from a television that was admittedly on inside the residence. *See* Plfs' SOMF ¶ 18. Nitti claims that the landlord came outside at approximately 6:30 a.m. *See* Nitti SOMF ¶ 19. Plaintiffs claim that the landlord never stepped outside, that he had come downstairs immediately after the banging and shouting began, and that he had sent a text message to Plaintiff Charland at 6:25 a.m., which was after he had come downstairs and spoken to Nitti. *See* Plfs' SOMF ¶ 19. During the conversation between Nitti and the landlord, the parties agree that the landlord indicated that Charland was at work, that Williams sometimes visited the home, but the parties dispute whether the landlord indicated to Nitti that Williams had access to the house. *See id.* ¶ 20.

At approximately 6:40 a.m., having received no response from anyone at Plaintiffs' residence, S/A Nitti and several members of the arrest team proceeded to an address in Rotterdam, New York, that had been provided as a possible alternative address for Williams. *See* Nitti SOMF ¶ 21. The officers arrived at the Rotterdam address at about 7:16 a.m. and learned at that time that the suspect no longer lived there. *See id.* ¶ 22. At some point thereafter, the arrest team returned to 2124 Avenue B and again knocked loudly and announced their presence. *See* Plfs' SOMF ¶ 26. The landlord again spoke with Nitti, either from his doorway or the exterior of the townhouse, and, with Plaintiff Charland's consent, the landlord gave Nitti Charland's cell phone number. *See id.* ¶ 27. Nitti claims that the landlord again confirmed that Williams had access to Plaintiffs' residence, which Plaintiffs deny. *See id.* ¶ 28.

S/A Nitti called Plaintiff Charland at the number given to him by the landlord. *See id.* ¶ 29. Charland answered, and S/A Nitti identified himself and explained that he had a warrant for Williams arrest. *See id.* ¶ 30. Nitti claims that, during this conversation, Charland informed Nitti that although Williams no longer lived at the residence, he still had access to it and free reign to visit his children who lived there. *See* Nitti SOMF ¶ 31. Plaintiffs dispute that Charland told Nitti that Williams had access or free reign to visit the home. *See* Plfs' SOMF ¶ 31. During this conversation, Charland informed S/A Nitti that Williams' four children were inside the home, and her 16-year old stepdaughter (who is Williams' daughter by another mother), was watching her three younger children while she worked. *See* Plfs' SOMF ¶ 33. Charland also gave S/A Nitti Williams' cell phone number, but offered to call him herself and stated that she would ascertain Williams' location. *See id.* ¶ 34. S/A Nitti asked Plaintiff Charland to call him back after she spoke with Williams. *See id.* ¶ 35.

6

When Nitti and Charland spoke again, Charland informed Nitti that Williams was at his lawyer's office for the purpose of turning himself into Nitti. *See id.* ¶ 37. S/A Nitti informed Charland that he and other officers had been knocking loudly on her front door that morning on two occasions and no one answered, raising the officers' suspicion level. Charland claims that she again informed Nitti that Williams was not in the house, and that her children "sleep like the dead" and "know not to answer the door when I am not home." *See id.* ¶ 38. Nitti claims that he asked Charland to contact her children by phone and tell them to answer the door. Nitti SOMF ¶ 41. Charland claims that she offered to have her children come downstairs so that Nitti could verify, from outside the home, that they were safe. *See* Plfs' SOMF ¶ 41.

Soon thereafter, Charland's step-daughter, K.A., opened the front door and S/A Nitti and TFO Watson were first in the group of officers outside the door. *See* Plfs. SOMF ¶¶ 42-43. Nitti claims that the officers identified themselves and told K.A. that they were looking for Williams pursuant to an arrest warrant. *See* Nitti SOMF ¶ 44. Charland claims that Nitti asked who was in the house (to which K.A. responded just herself and her three sisters) and specifically whether Williams was in the house, but did not identify himself or mention a warrant. *See* Plfs' SOMF ¶ 44. K.A. stated that Williams was not present. *See id.* ¶ 45.

Either S/A Nitti or TFO Watson then asked K.A. whether the officers could come inside to look for Williams. Nitti claims that as K.A. opened the door, she responded "okay." Plaintiffs dispute this claim and assert that K.A. responded that she was not comfortable letting them in. Plaintiffs further assert that Nitti asked K.A. who else was in the home and instructed her to have the children come downstairs, as he was concerned for their safety. K.A. then called upstairs for the other children to come downstairs and, as she turned her back, S/A Nitti and other officers entered the home without permission. *See* Nitti SOMF ¶¶ 46-47; Plfs' SOMF ¶¶ 46-47. Nitti

7

claims that he and TFO Watson entered the home first, and then asked K.A. to have the other children come downstairs. *See* Nitti SOMF ¶¶ 48-49.

Next, Nitti claims that one of the officers instructed all four children to sit together on a couch near the front door, and before they sat down, one of the officers checked the sides and undersides of the cushions for weapons. *See* Nitti SOMF ¶ 51. Plaintiffs claim that the children never left the stairs and that the officers searched the couches only after they had searched the rest of the home. *See id.* One officer stayed with the children, while the others unholstered their pistols and panned out within the home. *See* Plfs' SOMF ¶ 53. Nitti claims that the officers searched only places inside the home where a person could be hiding, including inside closets and under beds. *See* Nitti SOMF ¶ 54. Plaintiffs claim that the officers went through a large plastic box full of K.A.'s clothing, pulled stuffed toy animals off the walls, pulled open drawers in a dresser, dumped clothing on the floor, viewed the contents of opened letters addressed to Charland's sister, went through a box of pictures, and searched the couches in the living room. *See* Plfs' SOMF ¶ 54. After approximately ten minutes, the officers concluded that only the children were inside the home and left. *See* Plfs' SOMF ¶ 55. Shortly thereafter, Williams was arrested without incident outside of his attorney's office.

No one saw S/A Nitti open any mail. *See id.* ¶ 61. None of the children were upstairs when the officers and agents went upstairs. *See id.* ¶ 62. No one saw S/A Nitti open any dresser drawers. *See id.* ¶ 63. No one saw S/A Nitti open a storage tub. *See id.* ¶ 64. Nitti claims that none of the Plaintiffs returned to the house for a week after the search. *See* Nitti SOMF ¶ 66. Plaintiffs admit that they did not stay in the house for a week after the search, but that K.A. surveyed the house before she left, and that all Plaintiffs returned to the home on the evening of October 5, 2010, to collect clothes and meet with their attorney. *See* Plfs' SOMF ¶ 66.

## III. DISCUSSION

**A.     Summary Judgment Standard**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     Analysis**

**1.     *Standards Applicable to Searches Conducted Pursuant to Arrest Warrants***

An arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives, or in which the officer reasonably believes him to live, when there is reason to believe that the suspect is present within the residence. *See Payton v. New York*, 445 U.S. 573, 603 (1980); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir.), *cert. denied*, 461 U.S. 931 (1983); *United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir.), *cert. denied*, 516 U.S. 869 (1995). The rationale is that where "there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that [the suspect's] arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." *Payton*, 445 U.S. at 602-03.

In *Steagald v. United States*, the Supreme Court held that without a search warrant or other justifying circumstances, law enforcement officers may not enter the home of a third party to search for the subject of an arrest warrant. 451 U.S. 204 (1981). As the Second Circuit stated in *United States v. Lovelock*:

> The principle discussed in *Payton*, allowing officers to enter the residence of the suspect named in the arrest warrant, does not authorize entry into a residence in which the officers do not believe the suspect is residing but believe he is merely visiting. *See Steagald v. United States*, 451 U.S. at 213–14 & n.7, 101 S.Ct. 1642, 68 L.Ed.2d 38. *Steagald* did not, however, prohibit entry into a residence reasonably believed to belong to the person named in the arrest warrant. The Court ruled that officers seeking to execute an arrest warrant for one Ricky Lyons needed in addition a search warrant (or Steagald's consent) in order to execute the arrest warrant in the residence not of Lyons but of Steagald. While noting Payton's statements that an arrest warrant authorizes officers to enter the suspect's own home to execute the warrant when there is reason to believe he is there, *see Steagald*, 451 U.S. at 214 n.7, 101 S.Ct. 1642, the Court explained that the agents in *Steagald* had "sought to do more than use the warrant to arrest Lyons . . . in *his*

> home; instead, they relied on the warrant as legal authority to enter
> the home of a third person based on their belief that Ricky Lyons
> might be a *guest* there." *Id.* at 213, 101 S.Ct. 1642 (emphases
> added). The Court noted that "the situations in which a search
> warrant will be necessary are few. As noted in *Payton v. New York*,
> [445 U.S.] at 602–603, 100 S.Ct. 1371, an arrest warrant alone will
> suffice to enter a suspect's own residence to effect his arrest."
> *Steagald*, 451 U.S. at 221, 101 S.Ct. 1642.

*Lovelock*, 170 F.3d at 344.

In *United States v. Lauter*, 57 F.3d 212, 215 (2d Cir. 1995), the Second Circuit held that in order to authorize entry into a person's home to execute a warrant for his arrest, the officers' belief that the residence to be entered is the home of the person named in the warrant need not be supported by "probable cause." Rather, "the proper inquiry is whether there is a *reasonable belief* that the suspect resides at the place to be entered to execute [the] warrant, and whether the officers have reason to believe that the suspect is present." *Id.* The officers' belief need not be correct. "What a citizen is assured by the Fourth Amendment is not that no government search of his house will occur in the absence of a warrant or an applicable exception to the warrant requirement, but that no such search will occur that is unreasonable." *U.S. v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999) (internal citations and quotations omitted). The constitutional requirement is that the officers have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist. *Id.* at 344.

When executing an arrest warrant in a residence, officers may perform a protective sweep incident to the arrest to protect themselves or others. *Lauter*, 57 F.3d at 216; *see also Magluta*, 44 F.3d at 1535 ("in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the

11

location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry").

In *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the Supreme Court explained the permissible scope of a protective sweep incident to arrest and held that during an arrest, officers may "without probable cause or reasonable suspicion[ ] look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Beyond that limited cursory inspection, however, the officer must have articulable facts that support an inference that the area to be swept harbors an individual posing danger to those present. *Id.*

### 2. *Qualified Immunity*

In support of his qualified immunity defense, Defendant Nitti asserts that no clearly established right was violated and that Defendants' entry into Plaintiffs' residence to execute a valid arrest warrant was lawful and reasonable. Nitti states that it was reasonable, given the totality of the circumstances, for him to believe that Williams lived at the Avenue B address and was present there on the morning of October 5, 2010. Nitti further states that the brief sweep of the residence did not violate Plaintiffs' Fourth Amendment rights.

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (holding that qualified immunity is not merely immunity from damages but also "immunity from suit"). "[T]he salient question [in determining qualified immunity] is whether the state of the law . . . gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741

(2002). As qualified immunity is an affirmative defense, the burden of pleading it falls on the defendants. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (citations omitted); *see also Varrone v. Bilotti*, 123 F.3d 75, 78 (2d Cir. 1997) (holding that the "defendants bear the burden of showing that the challenged act was objectively reasonable" (citation omitted)).

The qualified immunity determination consists of two steps, which a court may consider in either order. *See Seri v. Bochicchio*, 374 Fed. Appx. 114, 116 (2d Cir. 2010) (citation omitted). The first step is to determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (citations omitted). The second is a determination of "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.* (citation omitted).

A right is "clearly established" if "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "To determine whether a right is clearly established, we look to: (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question; and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (citing *Schecter v. Comptroller of City of N.Y.*, 79 F.3d 265, 271 (2d Cir. 1996)). "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

If there is no dispute as to any material fact, the issue of whether the official's conduct was objectively reasonable is an issue of law to be decided by the court. *See id.* at 368 (citation omitted). Any unresolved factual issues, however, must be resolved by the jury. *See id.* (citations

13

omitted). Once the court has received the jury's decision as to "what the facts were that the officer faced or perceived," the court must then "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003) (quotation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (quotation omitted).

As discussed above, consistent with the Fourth Amendment, a law enforcement officer executing an arrest warrant may enter a home, without a search warrant, when he has "a reasonable belief" that the subject of the arrest warrant "resides at the place to be entered" and "is present." *Lauter*, 57 F.3d at 215. Summary judgment on qualified immunity is appropriate when "a jury, viewing all facts in the light most favorable to the plaintiff, could conclude that officers of reasonable competence could disagree on the legality of the defendant's actions." *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001).

In the present matter, Plaintiffs claim that immediately after Defendants arrived at their home and began banging on the door and shouting "Police," their landlord came downstairs and spoke with Nitti. During the conversation, Plaintiffs contend, the landlord informed Nitti that Williams did not live there, but sometimes visited the home. Notably, the parties dispute whether the landlord indicated to Nitti that Williams had access to the house.

The parties also dispute the timeline of events which followed the officers' initial attempt to serve the arrest warrant on Williams, which largely goes to the credibility of the witness. Further, the parties dispute whether there was activity (or lack thereof) in the home upon the officers' arrival which would give rise to the officer's "suspicions" – i.e., whether lights were turned off after the officers knocked and announced their presence. The parties also dispute the

significance of two unregistered vehicles parked in Plaintiffs' driveway, and whether those vehicles were traceable to Williams.

After Defendants' second attempt to serve the warrant, Defendant Nitti spoke with Plaintiff Charland over the phone. Defendant Nitti contends that Charland confirmed that Williams had access to the residence, which Charland strenuously denies. Charland claims she informed Nitti that Williams was not in the home and that only his four children were there. Thereafter, Charland spoke with Williams and informed Nitti that Williams would turn himself in at his attorney's office in downtown Schenectady. Charland claims that she informed Nitti the reason no one had answered the door that morning was because her children were instructed not the answer the door when she was not home.

The parties agree that the oldest child, K.A., then opened the front door; however, their respective version of the events that transpired thereafter differ significantly. Nitti claims that K.A. gave verbal consent for the officers to enter and verify that Williams was not in the residence. Plaintiffs claim that Nitti entered without consent while K.A.'s back was turned. The parties further dispute where the children were located during the search, when the couches were searched, and whether certain places outside the permissible scope of a protective sweep were searched.

As an initial matter, taking Plaintiffs' version of events as true, a reasonable officer would have known that the conduct alleged violated a clearly established right. It was clearly established in 2010 that officers could not search for the subject of an arrest warrant in a third-party's home absent a search warrant for the home or an exception to the warrant requirement. *See Steagald*, 451 U.S. at 215-216. In light of the differing accounts of what occurred on October 5, 2010, the Court finds that questions of fact exist which preclude granting Defendant Nitti's

15

motion at this time. For the Court to determine that he is entitled to qualified immunity, it would have to engage in improper credibility determinations, which it is unwilling to do. There are questions of fact regarding whether Nitti reasonably believed Williams lived at Plaintiffs' residence and was within that residence on October 5, 2010, or whether Nitti had Plaintiffs' consent to enter the home. These questions are material to the reasonableness of the search of Plaintiffs' home and the question of qualified immunity must, therefore, be decided by a jury. *See Werbicki v. County of Los Angeles*, 32 Fed. Appx. 302 (9th Cir. 2002) (affirming denial of the defendant's motion for summary judgment on qualified immunity grounds where "[a]n objectively reasonable officer would have known that he could not enter the house pursuant to an arrest warrant (or order other officers to enter) without consent, or a reasonable belief that [the target of the arrest warrant] resided there and was actually present"); *Slusar v. Harff*, No. 2:11-cv-1311, 2013 WL 3168585 (W.D. Pa. 2013) (denying reconsideration of denial of summary judgment on qualified immunity grounds where police entered and searched the plaintiff's home in an attempt to serve arrest warrants on the plaintiff's boyfriend); *Lyles v. City of Barling*, 17 F. Supp. 2d 848 (W.D. Ark. 1998) (finding that questions of fact as to whether police officers possessed a reasonable believe that subject of arrest warrant was present inside at the time officers entered home precluded summary judgment on qualified immunity grounds). Accordingly, Defendant Nitti's motion for summary judgment on qualified immunity grounds is denied.

### 3. *Fourth Amendment*

#### a. *Whether a Fourth Amendment violation occurred*

Defendant Nitti argues that he is entitled to summary judgment on the merits of Plaintiffs' Fourth Amendment claims because the undisputed facts establish that no violation occurred. "Because there is no dispute as to any of the facts on which S/A Nitti based his reasonable belief

16

that Williams lived at and was present at Plaintiff Charland's address, the arrest team's entry into the residence to execute an arrest warrant did not violate the Fourth Amendment." Dkt. No. 31-1 at 19.

Contrary to Nitti's asserton, as discussed above, there are genuine issues of material fact regarding what took place on the morning of October 5, 2010, and whether Nitti's belief that Williams lived at and was present at Plaintiffs' residence was reasonable. Accordingly, Defendant Nitti's motion for summary judgement on this basis is denied.

### b.     *Defendant Nitti's personal involvement*

To state a valid *Bivens* claim against a federal official in his individual capacity the plaintiff must allege that "he has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006). *Bivens* claims, similar to suits under 42 U.S.C. Section 1983, "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009); *see Thomas v. Ashcroft*, 470 F.3d at 496 ("[I]n *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation."); *Marsden v. Fed. Bureau of Prisons*, 856 F. Supp. 832, 835 (S.D.N.Y. 1994) ("Under *Bivens*, as under § 1983, a defendant's 'personal involvement' in an alleged deprivation of constitutional rights is a prerequisite to an award of damages."). The "personal involvement" requirement is satisfied where "a plaintiff demonstrates that a defendant directly participated in the acts alleged to constitute a violation of plaintiff's rights." *Wallace v. Conroy*, 945 F. Supp. 628, 637 (S.D.N.Y. 1996). Because personal involvement is a prerequisite to liability under *Bivens,* federal officials who are not personally involved in an alleged constitutional deprivation

may not be held vicariously liable for the acts of subordinates. *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987).

However,

> [i]t has long been the law in this circuit that a supervisor's personal involvement may be found where she: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the wrong after being informed of the violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

*Vazquez-Mentado v. Buitron*, 2014 WL 318329, *2 (N.D.N.Y. Jan. 29, 2014) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Although "[t]he Second Circuit has expressly declined to determine whether [*Ashcroft v.*] *Iqbal* eliminated any of the *Colon* bases for liability," a majority of courts in this circuit that have considered this question have concluded that "extension of *Iqbal* to the Fourth Amendment context is unwarranted." *Id.* at *2 (collecting cases).

Defendant Nitti argues that he is entitled to summary judgment as to Plaintiffs' claims relating to the sweep of the residence once the officers were inside the home. Nitti contends that there is no evidence that could establish he was personally involved in the alleged wrongdoing. Nitti does not specify which alleged illegal acts he was not personally involved in. Plaintiffs argue that Nitti admits that he was personally involved in the search of the living room couches, which is sufficient to defeat Nitti's motion for summary judgment.

Resolving all ambiguities and drawing all reasonable inferences in the light most favorable to Plaintiffs, the Court finds that genuine issues of material fact preclude summary judgment on this issue. As an initial matter, it is undisputed that Defendant Nitti participated

18

directly in the allegedly illegal entry into Plaintiffs' home and the resulting search. In addition, as the leader of the arrest team, Nitti personally directed the actions of certain officers once inside the home. Moreover, there is sufficient evidence in the record from which a reasonable jury could infer that Nitti was, *inter alia*, grossly negligent in supervising subordinates who committed the alleged wrongful acts. *See Warren v. Williams*, No. Civ.A. 304CV537, 2006 WL 860998, *44 (D. Conn. Mar. 31, 2006) (denying the defendant-supervisor's motion for summary judgment on the grounds that a reasonable jury could find the defendant liable under several theories of supervisory liability, including grossly negligent supervision, for failing to intervene to prevent impermissible search activities outside the scope of the warrant). Accordingly, Defendant Nitti's motion for summary judgment on the grounds of lack of personal involvement is denied.

## IV. CONCLUSION

After reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant Nitti's motion for summary judgment is **DENIED**; and the Court further

**ORDERS** that the parties' counsel shall be available for a telephone conference on April 14, 2014 at 10:30 a.m. to discuss setting a trial date; and the Court further

**ORDERS** that the Clerk of Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 31, 2014
      Albany, New York

Mae A. D'Agostino
U.S. District Judge